(50 South. 540.)

No. 17,570.

### WEISSHAUS v. NEW ORLEANS RY. & LIGHT CO.

(Oct. 18, 1909.)

STREET RAILROADS (§ 90*)—INJURIES TO PERSONS ON TRACK—DUTY OF MOTORMAN.

It is the duty of a motorman in charge of an electric car, moving it up a narrow street, to guard against running it upon vehicles on the track directly in front and in full view of him. He should exercise the greatest prudence and caution to avoid inflicting injury. He has the vantage ground over the parties in front, in knowing the exact situation and condition of affairs ahead of him. He would have no right to take advantage of even tardy action on the part of a driver of a wagon in removing it from the track, to run into and crush it. He should use every exertion to save the situation and enable the vehicle to be placed in a position of safety. The motorman in this case was greatly at fault. The plaintiff was not in the least degree blamable. He was at the time of the accident driving his covered wagon heavily loaded with charcoal slowly up Laurel street—a narrow street with a railway track upon it, planked between the rails, and with very little space outside of the rails to the curbing of the gutter. The horse was on the planks; the wagon itself mostly upon it. It was rightfully occupying the track when one of defendant's cars, in charge of a motorman, moving at full speed, ran into it without warning from the rear, breaking the wagon and painfully injuring the plaintiff. The wagon did not go upon the track just before the car reached .the spot, suddenly, and too late for the motorman to stop the car. It was partly on the track all the while.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 190–192; Dec. Dig. § 90.*]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

Action by Jacob Weisshaus against the New Orleans Railway & Light Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Dart & Kernan, for appellant. F. B. Davenport, for appellee.

NICHOLLS, J. In plaintiff's petition it is alleged: That on April 28, 1908, petitioner, accompanied by his two brothers, were driving in petitioner's wagon on Laurel street, between Marengo and Constantinople, this city; the said wagon being on the uptown car track of defendant company and about halfway between Marengo and Constantinople streets.

That car No. 0102 of the Magazine line owned and operated by the defendant company was going uptown, and, running at an excessive and unlawful rate of speed, dashed into the rear of petitioner's wagon with such force and violence that all of the occupants were thrown out of the said wagon into the street; the wagon being reversed and overthrown.

That the violent impact of his body with the ground rendered him unconscious, and that he received dreadful bruises and contusions on his body and spine, and internal injuries from which he suffered intensely. That he was sent to the Charity Hospital, this city, and after returning to his home was confined to his bed under the care of a physician for a period of six weeks.

That he still suffered great pain by reason of the aforesaid accident, and he was informed and believed that his injuries were permanent, and that at that time he was under the care of a physician on account of said injuries.

That he was a salesman by occupation. That he was blind, and that at the time of the accident his brother, Morris Weisshaus,

was driving, and was endeavoring to get off the defendant company's track when the wagon was struck by defendant company's car. Petitioner avers that his earning capacity as a salesman had been destroyed, as he could no longer go out to solicit trade, and that he was incapable of pursuing any other occupation, and that by reason of said accident he had been deprived of his only means of making a livelihood.

That the running into the rear of his wagon, and the consequent injuries received by him, were occasioned solely and entirely by the gross fault, negligence, carelessness, and lack of skill of the motorman of the defendant company's car. That the said motorman was the employé and agent of the defendant company, and that, had he exercised prudence, ordinary watchfulness, and alertness, this accident could have been averted, petitioner's wagon being in plain view of the said agent of defendant company, and that it was the duty of the said motorman to have checked his car when he approached petitioner's wagon.

That his wagon was damaged to the extent of $64.75; that he spent for drugs, liniment, bandages, etc., the sum of $12.35; that he had incurred for physician's bills a sum exceeding $30—all on account of the said accident. And for the pain, agony, suffering, both mental and physical, and for the permanent injuries and deprivation of his earning powers, caused by said accident, petitioner was entitled to have and recover of the defendant company the sum of $10,000 and in addition he was entitled to have and recover the sum of $107.10 for damage to his wagon, for drugs, and for physician's bills.

He prayed for trial by jury.

Defendant answered. It pleaded the general issue according to law.

Further answering, it averred: That, if plaintiff was injured as alleged, he received said injuries through no fault or negligence of respondent, its servants, agents, or employés, but that his injuries resulted from his own carelessness and negligence.

That, at the time and place described in plaintiff's petition, plaintiff's driver attempted to cross respondent's track at a time when an uptown car was so close to the crossing that it was impossible for plaintiff's conveyance to have made the crossing in safety. That plaintiff's driver was aware of the approaching car, which was sounding a warning, and the failure of the driver (for whose acts plaintiff was responsible) to heed the warning was cause of the accident in which plaintiff claims to have been injured.

In view of the premises, respondent prayed that plaintiff's demand be rejected, and for judgment in respondent's favor, and for all general and equitable relief.

The jury returned a verdict in favor of the plaintiff for the sum of $2,000, and judgment was entered in conformity to the verdict. After applying unsuccessfully for a new trial, defendant has appealed.

Defendant's counsel summarizes the testimony of plaintiff's witnesses as follows:

"Weisshaus (the plaintiff) came out of Constantinople street with his wagon on the morning of April 28, 1908, at about 9 o'clock. Morris Weisshaus (a brother of the plaintiff) was driving. They turned into Laurel street, going uptown. The wagon was partly on the track and partly on the roadway to the right of the track. The car, when the wagon turned into Laurel street, was about Austerlitz street, and coming up rapidly. The wagon continued up the street slowly. It was loaded with charcoal in paper sacks. The motorman did not ring a gong, nor did the car make much of a noise. The motorman had his head turned to the left, as if talking to some one inside the car. He did not try to stop until the car struck the wagon. At the moment of collision the wagon was being pulled entirely onto the track to avoid a pile of cinders on the roadway to the right of the track. The car struck the wagon in the rear, and threw it off the track to the roadway on the left of the track, completely reversing it, so that the horse was facing downtown. The wagon was broken in the rear and was thrown to its side. The occupants were thrown out. The car continued for about two car lengths before stopping. According to plain-

tiff his horse was not hurt. Two months after the accident he sold him for what he cost.

"Samuel and Morris Weisshaus, brothers of the plaintiff, were on the wagon with him. Morris was driving, and was seated on the right of the wagon. Jacob was next to him, and Samuel was on the left. Both these witnesses tell the same story in almost identical words. Neither saw nor heard the car until it ran into them from the rear.

"Mrs. Boaz was talking with Mrs. Hubener, who lived at 4022 Laurel street, which is between Marengo and Constantinople streets, on the river side of Laurel street. They were engaged in a neighborly conversation concerning certain repairs being done to a house on the opposite side of Laurel street, about the middle 'of the block, in front of which the accident happened. Mrs. Boaz had been sick for some time before the accident, and had gone out to seek fresh air. She and Mrs. Hubener observed identically the same details as to the position of the car, when the wagon turned on the track, and the course the wagon took—that it was partly off and partly on the track, and that the motorman was not looking (had his head turned to the left), rang no gong, and the car ran about two lengths after the accident.

"Nick Pretorius, carpenter by trade, testified that he was going up Laurel street. He had stopped at the building being repaired, and then continued on his way up Laurel street for about 90 feet, when he turned around and saw the wagon pulling full into the track, with the car coming full speed behind it, the motorman looking to the left. The wagon was partly on and partly out of the tracks, etc. His version of the occurrence at the time is told in almost the same words as the other witnesses.

"Warren Butler, a colored laborer, testified that he had been engaged in wheeling cinders from the pile into the house being repaired. Just before the accident he had gone to the middle of the square below for a piece of ice. He had returned to work, but at the time of the accident was just standing up, looking at the wagon coming up. He noticed how it was on the track, that the motorman gave no warning, had his head turned to the side, did not try to stop the car until after the collision, the wagon was overturned, and the horse faced downtown. The car went about two lengths after the collision."

Referring to the testimony on defendant's behalf, its counsel says:

"The defendant's witnesses were the motorman, the conductor, and a passenger in the car. These witnesses say that the wagon was stopped near the pile of cinders, and as the car was about 40 or 50 feet away the wagon suddenly pulled across the track, as if the driver wanted to go around the pile of cinders; that, as the horse and front of the wagon cleared the track, the car struck the rear wheel of the wagon, overturning it; that the car went about 60 or 80 feet after the collision.

"The motorman says, and is corroborated by Mr. McCormick, the passenger, that as soon as the wagon began to pull towards the track the motorman rang his bell violently and began to apply the brake and use the appliances for making an emergency stop; that the motorman was looking ahead, and was not talking to any one in the car, and did not have his head turned to the side. McCormick was seated on the front seat on the left side. His attention was attracted by the violent ringing of the gong and hearing the motorman cry out to the wagon.

"The conductor was on the rear platform. His attention was attracted by the sudden checking of the car and the violent ringing of the gong. He looked up in time to see the wagon beginning to move onto the track. The car was then about 40 feet away. The motorman put on the brakes and tried to stop, but could not.

"Both the motorman and conductor concur in saying that a car going at the speed this car was then running could not be stopped in less than 120 to 125 feet.

"At the time of the accident the motorman had had 6 days' experience in running a car without the presence of an instructor. He had been under tutelage for 13 days before being given the car, and during that time he had operated cars by himself on all the lines of the city railroad system."

Counsel criticises the testimony of the plaintiff's witnesses, but we see nothing to break the force of their statements.

Laurel street, on which the accident occurred, is a narrow, unpaved street, with a single car track thereon, which is planked between the rails. There is a dirt roadway on each side of the track just wide enough for vehicles to clear the track by resting their outer wheels upon the curb of the gutter. The track is generally used by vehicles passing up and down the street.

The contention of the defendant is: That plaintiff's wagon, after it had been driven into Laurel street, was at one side, and on the dirt road to the right, and entirely clear of the track. That it had stopped on that road, and was in a point of safety therein, when the electric car came in sight, and as it came up the track.

That it remained so until just before the car reached it. That when matters were in

this condition, and when it was too late for the motorman to have stopped the car and avoided a collision, though making every effort to do so, the driver of the wagon suddenly attempted to drive it across the track in front of the approaching car. That the wagon at the time of the accident was diagonally on the track. That the car struck the wagon on the side, and not in the rear, as testified to by all of defendant's witnesses.

The testimony, in our opinion, establishes beyond a doubt that at no time after the wagon turned into Laurel street was it on the dirt road clear of the track, in a position of safety from the approach of an electric car moving up that street in its rear; that at no time had it stopped on that street; that it is not true that, being in a position of safety on the side of the track, the driver of the wagon suddenly attempted to drive it in front of the approaching car, when it was too late for the motorman to avoid a collision with it, in spite of all his exertions.

On the contrary, a part of the wagon had been continuously on the track from the time it was driven into Laurel street. The right-hand wheels alone were off the track and on the roadway to the right of the track. The wagon was never stopped, but was proceeding at a slow pace up that street. The motorman was not surprised by the sudden shifting of its position from the road to the track. The wagon was in the open view of the motorman all the time, directly in front of him. There was nothing to intercept his view. The time of the collision was near 9 o'clock in the morning, and the place a public street, on which the wagon was authorized to be driven as it was; there being nothing in its front on the street at the time. The wagon was a closed one, heavily loaded with bags of charcoal. It was not pretended that as a fact any of the occupants knew of the approach of the car from the rear, and we fail to see wherein the plaintiff was chargeable with any fault. The plaintiff had a right to assume that any one approaching from the rear would give him notice of his approach. No notice was given in this case.

The car moving up the street at a leap (as the witnesses state), by which was meant full speed, ran without warning into the wagon and with great force, overturning it and throwing the occupants violently upon the ground.

The defendant was guilty of great fault in doing so, and is legally responsible to the plaintiff for damages for the same. Plaintiff's witnesses testify that the motorman did not ring his bell. Defendant's witnesses testify that he did. We are satisfied that, if the bell was in fact rung, it was at the last moment, when the ringing was of no service. The duty of a motorman in charge of an electric car, when moving upon a narrow street, to guard against running into a vehicle on the track in clear view of him and directly in his front, moving in the same direction, is too plain for discussion.

He should exercise the greatest caution and prudence. He has the vantage ground of knowing the exact situation in front. He has no right to take advantage of even tardy action on the part of the driver of the wagon in getting off of the track, or in crossing it to run into and crush it; but he should use every exertion to save the situation and enable the vehicle to get into a position of safety.

This was not done in this case. Defendant insists that the car did not strike the wagon in the rear, but on the side. We do not think that fact makes any difference in the legal status of the parties. Whether the wagon at the time of the accident was being moved directly to the front, or whether it was at the time being moved diagonally on the track, is of no moment. In either case the defendant was at fault.

We think the verdict of the jury in award-

ing the plaintiff damages against the defendant was correct. The defendant contends that, even if it be liable, the damages awarded are too great.

The evidence shows that the plaintiff is 26 years old; that his occupation is that of selling charcoal to groceries from the wagon belonging to him, which was run into by defendant's car; that the horse driven in the wagon, as well as the wagon itself, belonged to him; that from his business he was earning and had earned about $75 a month clear; that he was blind, and had been for about five years, and required the assistance of his brothers in driving his wagon, for which service he paid them; that he was thrown violently to the ground, and was rendered unconscious by the fall; that he was taken in that condition to the Charity Hospital, where he remained, however, only a short time, when he was taken to his home, where he was confined to his bed for about a month and in his room another month; that he suffered, and still suffers, much pain from the fall. The plaintiff was severely bruised, but there was no permanent injury received. There was no fracture of the bones. Plaintiff has not been in business since the injury; but we do not think his earning capacity differs very greatly from what it was before. He was blind at the time of the accident, and had to depend to a very considerable extent upon assistance from his brothers. They, or some one else, would still be able to give him the assistance needed as before. The horse attached to the wagon was not badly hurt. Plaintiff has sold it for the same amount he gave for it. The wagon, though placed beyond service at the time, has since been thoroughly repaired at a cost of $65. It had cost the plaintiff $85. The principal element of damages to the plaintiff was the pain received by him, which cannot well be gauged or estimated, though beyond doubt he suffered. The jury evidently took it into consideration, and had a right to do so, in rendering a verdict. We do not think that, weighing all the facts shown on the trial, the verdict was too high, and that it was merely sympathetic.

The verdict of the jury and the judgment of the court appealed from are correct, and they are hereby affirmed.